JUDGE McMAHON

13 CIV 5652

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

RAMI SHAMIR,

                        Plaintiff,

      -v-

THE CITY OF NEW YORK; New York City Police
Department Lieutenant ROBERT MURRAY and New
York City Police Department Officer (P.O.) John DOE
in their individual capacities,

                        Defendants.

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

**ECF CASE**

RECEIVED AUG 13 2013 U.S.D.C. S.D.N.Y. CASHIERS

------------------------------------------------------------------x

Plaintiff RAMI SHAMIR, by his attorneys DAVID B. RANKIN of Rankin & Taylor, PLLC as and for his complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, with pendant claims under New York law.

2. Mr. SHAMIR's rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis arrested and assaulted Mr. SHAMIR. By reason of defendants' actions, including their unreasonable and unlawful conduct, unreasonable search, and protracted seizure, Mr. SHAMIR was deprived of his constitutional rights.

3. Plaintiff seeks an award of compensatory and punitive damages and attorneys' fees.

1

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (a) (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

5. Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiff's claim arose in the Southern District of New York.

6. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

7. Consistent with the requirements of New York General Municipal Law § 50-e, Mr. SHAMIR filed a timely Notice of Claim with the New York City Comptroller on or about December 13, 2013, within 90 days of the accrual of his claims under New York law. Thus, this Court has supplemental jurisdiction over Mr. SHAMIR's claims under New York law because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

8. Mr. SHAMIR's claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

9. Mr. SHAMIR was at all times relevant to this action a resident of the County of Kings in the State of New York.

10. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a

2

police force and the employment of police officers as said risks attach to the public consumers of the services provided by NYPD.

11. Defendants New York City Police Department Lieutenant ROBERT MURRAY ("Lt. MURRAY") and New York City Police Department Officer ("P.O.") JOHN DOE ("P.O. DOE") were at all times relevant herein employees and agents of the NYPD. New York City Police Department Officer ("P.O.") JOHN DOE ("P.O. DOE").Collectively defendants MURRAY and DOE are referred to as individual defendants.

12. Defendant P.O. DOE the name John Doe being fictitious as the true names and shield number is not presently known.[1] However, said defendant is an employee or agents of the NYPD. Accordingly, said defendant is entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to N.Y. G.M.L. § 50-k. The Law Department, then, is hereby put on notice (a) that plaintiff intends to name said officer as a defendant in an amended pleading once the true names and shield number of said defendant becomes known to plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

13. At all times relevant herein, Lt. MURRAY and P.O. DOE were acting under color of state law in the course and scope of their duties and functions as an agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of his lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as an officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

14. The individual defendants' acts hereafter complained of were carried out intentionally,

---

[1] By identifying said officer as "John Doe" plaintiff is making no representations as to the gender of said officer.

3

recklessly, with malice and gross disregard for plaintiff's rights.

## STATEMENT OF FACTS

15. The events described herein occurred in the vicinity of City Hall Park in the County and State of New York on the afternoon of September 15, 2012 and were at or around events related to Occupy Wall Street (OWS).

16. Mr. SHAMIR was lawfully attending a demonstration at the above location.

17. On information and belief, (a) member(s) of the NYPD gave what appeared to be an order to disperse.

18. Mr. SHAMIR complied with police orders by leaving moving from where he was located.

19. Members of the NYPD began arresting individuals who, on information and belief, did not comply with the officers' orders.

20. Mr. SHAMIR called a New York City Police Officer a "thug."

21. Mr. SHAMIR was then unlawfully arrested in apparent retaliation for his comment.

22. P.O. DOE placed Mr. SHAMIR in zip-tie handcuffs and intentionally tightened them excessively, causing injury to Mr. SHAMIR's lower arms.

23. Mr. SHAMIR complained and requested the handcuffs be loosened at various times during his detention to employees of the City of New York.

24. These requests were denied.

25. Mr. SHAMIR was arraigned more than 24 hours later after his arrest.

26. After a number of court appearances, the prosecution against Mr. SHAMIR was dismissed pursuant to N.Y. Crim. Pro. L. § 170.55.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF RIGHTS
## FOURTH, FIFTH & FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983
### (Lt. MURRAY and P.O. DOE)

27. Mr. SHAMIR incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

28. By the acts described above, including but not limited to (i) arresting Mr. SHAMIR for 56 RCNY 1-04(p) and (ii) issuing the criminal process, Lt. MURRAY and P.O. DOE, under color of state law, deprived Mr. SHAMIR of his rights, privileges and immunities secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including without limitation deprivation of the following constitutional rights:

   a. freedom from unreasonable searches and seizures of his person, under the Fourth and Fourteenth Amendments,

   b. freedom from arrest without probable cause, under the Fourth and Fourteenth Amendments,

   c. freedom from false imprisonment, under the Fourth and Fourteenth Amendments, and

   d. freedom from abuse of process, under the Fifth and Fourteenth Amendments.

29. Lt. MURRAY's and P.O. DOE's deprivation of Mr. SHAMIR's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM FOR RELIEF
## RETALIATORY ARREST
## FIRST AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983
### (Lt. MURRAY)

27. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

28. By the actions described above, Lt. MURRY arrested plaintiff in direct retaliation for both the content and viewpoint of plaintiff's speech, and he did so without having probable cause to arrest plaintiff for any offense. The acts and conduct of the Lt. MURRY was the direct and proximate cause of injury and damage to plaintiff and violated his rights under the First and Fourteenth Amendments, as secured through 42 U.S.C. § 1983.

29. As a result of the foregoing, plaintiff was deprived of his liberty, was forced to cease giving his speech, suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### THIRD CLAIM FOR RELIEF
### *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

30. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

31. All of the acts and omissions by the individual defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

32. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

33. The acts complained of were carried out by Lt. MURRAY and P.O. DOE in their capacites as a police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

34. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the unconstitutional policy, practice, or custom of conducting mass arrests at public events (whether they be spontaneous, permitted, or otherwise) without making individualized determinations of probable cause or reasonable suspicion.

35. This policy, practice or custom of conducting mass arrests at public events without making individualized determinations of probable cause or reasonable suspicion manifests itself in many forms, including but not limited to the following:

    a. Failing to supervise, train, instruct and discipline police officers concerning how to make individualized determinations of probable cause and/or reasonable suspicion at public events (whether they be spontaneous, permitted, or otherwise) or while making mass arrests at demonstrations or otherwise; and

    b. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers, and/or discouraging officers from failure to intervene to prevent same.

36. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

    a. Osterhoudt v. The City of New York, 10 Civ. 3173(RJD), 2012WL4481927 (E.D.N.Y., September 27, 2012) (Judge Dearie denied the City of New York's motion to dismiss parts (a) and (b) of this *Monell* claim by stating, "[s]hould such a de facto policy or practice of mass arrests exist, it will not likely be shown by direct evidence…[.] Sensitive to this formidable hurdle, I too conclude that plaintiff has 'nudged [his] claims across the line from conceivable to plausible.'");

    b. Long v. City of New York, 09 Civ. 9216 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, to wit, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

    c. Taylor-Mickens v. City of New York, 09 Civ. 7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

7

d. <u>Lin v. City of New York</u>, 09 Civ. 1936 (PGG) (S.D.N.Y.) (officers arrest <u>en masse</u> participants in a Critical Mass group bicycle ride, without individualized suspicion, including person lawfully photographing an arrest of a bicyclist in Times Square and a bystander after refusing an unlawful order to produce identification);[2]

e. <u>Colon v. City of New York</u>, 09 Civ. 00008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal/Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

f. <u>Callaghan v. City of New York</u>, 07 Civ. 9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and mass retaliatory arrests of bicyclists, not based upon individualized suspicion, engaged in expressive conduct, <u>to wit</u>, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

g. <u>Dunlop v. City of New York</u>, 06 Civ. 0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradicted sworn criminal complaint);

h. <u>Carmody v. City of New York</u>, 05 Civ. 8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

i. <u>MacNamara v. City of New York</u>, 04 Civ. 9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people, not based upon individualized suspicion, has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

---

[2] For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

j. McMillan v. City of New York, 04 Civ. 3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k. Avent v. City of New York, 04 Civ. 2451 (CBA) (CLP) (E.D.N.Y.) (same);

l. Smith v. City of New York, 04 Civ. 1045 (RRM) (JMA) (E.D.N.Y.) (same);

m. Powers v. City of New York, 04 Civ. 2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n. Allen v. City of New York, 03 Civ. 2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum, without first making individualized determinations of suspicion);

o. Nonnemann v. City of New York, 02 Civ. 10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

p. Richardson v. City of New York, 02 Civ. 3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

q. Barry v. New York City Police Department, 01 Civ. 10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

r. Taylor v. City of New York, 01 Civ. 5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

s. Walton v. Safir, 99 Civ. 4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

t. White-Ruiz v. City of New York, 93 Civ. 7233 (DLC) (MHD), 983 F. Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice

9

of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

u. Ariza v. City of New York, 93 Civ. 5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

37. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to discouraging police officers from reporting the corrupt or unlawful acts of other police officers, and/or discouraging officers from intervening to prevent same** are further evidenced, inter alia, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[3]

---

[3] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

10

  b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

  c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[4]

  d. Regarding defendant CITY's tacit condoning of and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[5] When it does, however, Police Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Commissioner Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[6] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[7]

---

[4] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[5] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[6] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[7] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

11

38. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

   a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

   > Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[8]
   >
   > [...]
   >
   > What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[9]

   b. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[10] Moreover,

---

[8] Mollen Commission Report, p. 36.

[9] Mollen Commission Report, pp. 40-41.

[10] Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

12

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said.
> "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.
>
> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[11]

    c. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[12]

    d. The CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[13] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay

---

[11] *Id.*

[12] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[13] In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, *available at* http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_out_35g_to_granny_busted_as_hooker.html.

the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense." According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[14]

e. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[15]

39. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, *inter alia*, by the following:

   a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

   b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

   c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

40. The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory

---

[14] *Id.*

[15] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

14

and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

41. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

42. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights.

43. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

44. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct,

and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD; and to require compliance with the Constitution and laws of the United States.

45. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

46. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, P.O. DOE felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up his blatant violations of plaintiff's constitutional rights.

47. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

48. The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and unlawful force.

### FOURTH CLAIM FOR RELIEF
### ASSAULT AND BATTERY
### UNDER THE LAWS OF THE STATE OF NEW YORK
### (Lt. MURRAY, P.O. DOE, and THE CITY OF NEW YORK)

49. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

50. By the actions described above, defendants did inflict assault and battery upon plaintiff. The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

51. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### FIFTH CLAIM FOR RELIEF
### FALSE ARREST AND FALSE IMPRISONMENT
### UNDER THE LAWS OF THE STATE OF NEW YORK
### (Lt. MURRAY and THE CITY OF NEW YORK)

52. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

53. By the actions described above, defendants caused to be falsely arrested or falsely arrested plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so. The acts and conduct of the defendants were the direct and

proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

54. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**SIXTH CLAIM FOR RELIEF**
**ABUSE OF PROCESS**
**UNDER THE LAWS OF THE STATE OF NEW YORK**
**(Lt. MURRAY and THE CITY OF NEW YORK)**

55. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

56. By the conduct and actions described above, defendants employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm the plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to the plaintiff, which was outside the legitimate ends of the process. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

57. As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENCE
## UNDER THE LAWS OF THE STATE OF NEW YORK
### (Lt. MURRAY, P.O. DOE, and THE CITY OF NEW YORK)

58. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

59. The acts and conduct of the defendants breached his duty of care to plaintiff.

60. The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff.

61. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

62. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## JURY DEMAND

63. Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

    a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation;

    b.    That he be awarded punitive damages against Lt. MURRAY and P.O. DOE; and

    c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

    d.    For such other further and different relief as to the Court may seem just and proper.

Dated: New York, New York
       August 9, 2013

                                Respectfully submitted,

By: _____
     David B. Rankin
     Rankin & Taylor, PLLC
     *Attorneys for Plaintiff*
     11 Park Place, Suite 914
     New York, New York 10007
     t: 212-226-4507